IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JOHN O. WILLIAMS,
     Petitioner,

vs.                           Case No.:  4:14cv629/RH/EMT

STATE OF FLORIDA,
     Respondent.
_____/

## <u>REPORT AND RECOMMENDATION</u>

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 17).  Petitioner filed a reply (ECF No. 24).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.      BACKGROUND AND PROCEDURAL HISTORY

Petitioner was charged in the Circuit Court in and for Leon County, Florida, Case No. 2007-CF-3046, with one count of lewd or lascivious molestation of a person less than 12 years of age (Count I), and one count of lewd or lascivious molestation of a person 12 years of age or older but less than 16 years of age (Count II) (Ex. A at 1).[1]  Following a jury trial, Petitioner was found guilty as charged as to Count I, and guilty of the lesser included offense of attempted lewd or lascivious molestation as to Count II (Ex. A at 39–40, Ex. B).  On March 20, 2009, the court adjudicated Petitioner guilty and sentenced him to life imprisonment on Count I, the term of imprisonment to be suspended after 25 years, at which time Petitioner would be placed on sex offender probation for life with an active GPS monitor (Ex. A at 63–80, Ex. H).  The trial court imposed a concurrent sentence of five years in prison on Count II (*id.*).  Petitioner was awarded 577 days of pre-sentence jail credit (*id.*). Petitioner filed a motion to correct sentencing error, pursuant to Rule 3.800(b)(2) of the Florida Rules of Criminal Procedure (Ex. I).  The state circuit court held a hearing on the motion (Ex. K), and subsequently denied it (Ex. L).

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 17).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Petitioner appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D09-1780 (*see* Ex. A at 81, Exs. M, N, O).  On September 29, 2010, the First DCA affirmed the judgment per curiam without written opinion (Ex. P).  Williams v. State, 48 So. 3d 59 (Fla. 1st DCA 2010) (Table).  The mandate issued November 24, 2010 (Ex. S).

On December 9, 2010, Petitioner filed a petition for writ of habeas corpus in the First DCA, Case No. 1D10-6676, alleging ineffective assistance of appellate counsel (Ex. T).  He subsequently amended the petition (Ex. U).  The First DCA denied the petition on the merits on February 23, 2011 (Ex. V).  Williams v. State, 60 So. 3d 1076 (Fla. 1st DCA 2011) (Mem).  The court denied Petitioner's motion for rehearing on May 5, 2011 (Ex. X).

On June 13, 2011, Petitioner filed another habeas petition in the First DCA, Case No. 1D11-3386 (Ex. Y).  On July 15, 2011, the First DCA dismissed the petition, pursuant to Baker v. State, 878 So. 2d 1236 (Fla. 2004) (Ex. BB).[2]  Williams v. State, 68 So. 3d 278 (Fla. 1st DCA 2010) (Mem).

_____

[2] In Baker, the Florida Supreme Court held that habeas relief was not available to obtain collateral post-conviction relief available by motion in the sentencing court pursuant to Rule 3.850; therefore, such petitions were subject to dismissal as unauthorized.

On November 17, 2011, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. CC at 1–28). The state circuit court set an evidentiary hearing and appointed counsel for Petitioner (Ex. FF).  Following the evidentiary hearing (Ex. HH), the circuit court denied the Rule 3.850 motion (Ex. II).  Petitioner appealed the decision to the First DCA, Case No. 1D13-4269 (Ex. JJ).  The First DCA affirmed the decision per curiam without written opinion on August 29, 2014 (Ex. MM).  The mandate issued October 20, 2014 (Ex. PP).  Williams v. State, 147 So. 3d 991 (Fla. 1st DCA 2014) (Table).

On March 4, 2013, Petitioner filed another habeas petition in the First DCA, Case No. 1D13-1117 (Ex. QQ).  The First DCA again dismissed the petition, pursuant to Baker, 878 So. 2d at 1236, on March 27, 2013 (Ex. RR).  Williams v. State, 109 So. 3d 889 (Fla. 1st DCA 2013) (Mem).

On September 12, 2013, Petitioner filed a habeas petition in the state circuit court (Ex. SS).  On October 29, 2013, the circuit court construed the petition as a Rule 3.850 motion, and struck it on the ground that it failed to comply with the certification requirement of the Rule, and Petitioner was represented by counsel in the pending Rule 3.850 proceeding (Ex. TT).

On February 26, 2014, Petitioner filed another habeas petition in the state circuit court (Ex. UU).  The court construed the petition as a Rule 3.850 motion and denied it on the ground that the issues raised therein could have and should have been raised on direct appeal (Ex. VV).  Petitioner appealed the decision to the First DCA, Case No. 1D14-1454 (Ex. WW).  The First DCA affirmed the decision per curiam without written opinion on July 3, 2014, with the mandate issuing August 29, 2014 (Ex. XX).  Williams v. State, 145 So. 2d 838 (Fla. 1st DCA 2014) (Table).

On October 14, 2014, Petitioner filed a Rule 3.850 motion in the state circuit court, alleging newly discovered evidence (Ex. BBB).  Petitioner filed a notice of voluntary dismissal on October 23, 2014 (Ex. DDD).  The court granted Petitioner's motion to dismiss, and dismissed the Rule 3.850 motion on May 19, 2015 (Ex. CCC).

Petitioner filed the instant federal habeas action on November 18, 2014 (ECF No. 1).

## II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the

judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.  In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3]  The appropriate test was described by Justice O'Connor as follows:

---

[3] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  Neelley

v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim. Moreover, where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See* Henderson v. Campbell, 353 F.3d 880, 890 n.15 (11th Cir. 2003).

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). "In determining whether a state court's decision represents an unreasonable application

of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)). The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See* Gill, *supra* at 1291 (citing Richter).  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See* Richter, 562 U.S. at 102; *see also* Gill, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."   28 U.S.C. § 2254(e)(1); see, e.g., Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by

clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Within this framework, the court will review Petitioner's claims.

## III.   PETITIONER'S CLAIMS

A.   <u>Ground One:  "The defendant's counsel was ineffective for failing to investigate and call three material witnesses who were known to counsel prior to trial."</u>

Petitioner alleges Christopher Hughley, Cathy Williams, and Bobby Hughley were material witnesses to the events underlying the charges (ECF No. 1 at 5–7).[4] He alleges these witnesses were identified in the police report, and Petitioner informed defense counsel that they were material witnesses. Petitioner alleges defense counsel was ineffective for failing to present their testimony at trial.

Respondent concedes Petitioner exhausted this claim in the state courts (ECF No. 17 at 43). Respondent contends the state court adjudicated the merits of the claim, and the adjudication was not contrary to or an unreasonable application of clearly established federal law (*id.* at 46–50).

### 1.     Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984). To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, Petitioner is not entitled to relief. *Id.* at 697.

---

[4] The page references to the parties' pleadings reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15).  Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).  Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at

690); <u>Lancaster v. Newsome</u>, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").  "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ."  <u>Michael v. Crosby</u>, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting <u>Chandler</u>, 218 F.3d at 1317).   Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'"  <u>Id.</u> (quoting <u>Putman v. Head</u>, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the <u>Strickland</u> standard, Petitioner's burden of demonstrating prejudice is high.  <i>See</i> <u>Wellington v. Moore</u>, 314 F.3d 1256, 1260 (11th Cir. 2002).   The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'"  <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 693).  However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome.  <u>Strickland</u>, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law.  <u>Strickland</u>, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  <u>Strickland</u>, 466 U.S. at 698; <u>Collier v. Turpin</u>, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting <u>Strickland</u>'s high bar is never an easy task."  <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010).  "Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult."  <u>Richter</u>, 131 S. Ct. at 788.  As the <u>Richter</u> Court explained:

> The standards created by <u>Strickland</u> and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so.  The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d).  When § 2254(d) applies, the

question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

*Id.* (citations omitted).

## 2.    <u>Federal Review of State Court Decision</u>

Petitioner raised this claim of ineffective assistance of trial counsel ("IATC") as Ground 1 of his Rule 3.850 motion (Ex. CC at 6–14).  The court held an evidentiary hearing, at which Petitioner was represented by counsel (Ex. HH).  Christopher Hughley and Cathy Williams testified at the hearing, as did Petitioner and his trial counsel (*id.*).

Cathy Williams testified that S.O., the victim of Count I, is her daughter (*id.* at 141).  Williams testified that at approximately 1:00 a.m. on July 25, 2007, S.O. came into her bedroom and told her that "Uncle Johnny" tried to pull her shirt up (*id.*). Williams testified that she got in her car and tried to find Petitioner, because Petitioner had left the house by that time (*id.*).  Ms. Williams testified that one week later, S.O. told her that the reason she "told the story" was that "Uncle Johnny" was intoxicated and talking loud, and S.O. was trying to rest, so S.O. told Williams that Petitioner tried to pull her shirt up so that Petitioner would leave the house (*id.* at 142).  Cathy Williams testified that she reported S.O.'s later statement to authorities (*id.*).  She

testified that she never spoke with either of Petitioner's defense attorneys, Deanna Hurt or Joel Remland, prior to trial (*id.*).  Ms. Williams identified S.O.'s handwriting on a written note, and the note was admitted into evidence (*id.* at 143).  The noted stated, "I told a story and the truth was that Uncle Jonny [sic] was talking loud.  I feel bad about what I did.  I should have not told a story." (Ex. EEE).  Ms. Williams testified that she did not pressure S.O. to exonerate Petitioner (Ex. HH at 144).  She testified that she only told S.O. to tell the truth (*id.*).  Ms. Williams testified that she was in jail on the day of Petitioner's trial, and was transported from the jail to the courthouse (*id.*).  She testified that she was willing to testify at Petitioner's trial in accordance with the testimony she just provided (*id.*).

On cross-examination, Cathy Williams testified that the reason she was in jail at the time of Petitioner's trial was that she failed to produce two of the State's three child witnesses (S.O. and Alishia Hughley) for Petitioner's trial when it was scheduled for an earlier date (Ex. HH at 145).[5]  Williams also admitted she failed to appear with the children for a meeting with the victim/witness unit of the State Attorney's Office, and she failed to appear for pre-trial depositions (*id.* at 146–47).  Counsel for the State asked Ms. Williams whether she ever had a telephone conversation with Petitioner

---

[5] Cathy Williams is the mother of one of the child victims, S.O., and a child witness, Alishia Hughley.  Ms. Williams is apparently the aunt of the other child victim, J.A.

while he was detained at the jail prior to trial (*id.* at 145–46).  Ms. Williams initially

denied that she ever had a telephone conversation, but then stated she did not recall

(*id.* at 146).  Ms. Williams denied that she and Petitioner ever discussed that if she

(Williams) did not show up with the girls for trial, the case would go away (*id.* at

147).  Ms. Williams testified that Petitioner was her boyfriend's co-worker, and she

considered him a friend (*id.* at 149).

Christopher Hughley testified that Cathy Williams is his girlfriend and the

mother of his children, including Alishia Hughley (one of the child witnesses) (Ex.

HH at 170–71). Mr. Hughley testified that S.O., one of the child victims, is his

stepdaughter (*id.*).  Hughley testified that on July 25, 2007, he and Petitioner got off

work and went to Hughley's house (*id.* at 171).  He testified that Petitioner then left

and went to his own house, but then returned to Hughley's house because he and his

girlfriend had an argument (*id.* at 171–72).  Hughley testified that Petitioner asked if

he could spend the night at Hughley's house, and Hughley agreed (*id.*).  Hughley

testified that he and Petitioner "had a few beers" that night (*id.*).  Hughley testified

that the girls were upset with him and Petitioner because they were noisy (*id.* at

172–73).  Hughley testified that he slept in a bedroom with Cathy Williams, and

Petitioner slept in the "front room," where the girls were sleeping (*id.* at 172–73).

Hughley testified that he heard noise, so he got up and went in the front room (*id.* at 173).  He testified that Petitioner and the girls were arguing, so Hughley went back in the bedroom, retrieved a blanket or cover, and brought it to Petitioner (*id.*). Hughley testified that he was outside the courtroom on the day of Petitioner's trial (*id.*).  He testified that during trial, a woman came out of the courtroom and told him that his testimony would be needed (*id.* at 174).  He testified that after that, he was told that the trial was in recess, so he went to the store (*id.*).  He testified that when he returned to the courthouse, a different woman told him that his testimony was not needed (*id.*).  Hughley testified that he was willing to testify at Petitioner's trial, and that his testimony would have been substantially similar to his testimony at the evidentiary hearing (*id.*).

Christopher Hughley admitted on cross-examination that he had previously been convicted of eight or nine felonies (Ex. HH at 175).  Hughley testified that there was a period of time during that night that Petitioner was alone with the girls (*id.*).  He admitted that because he was asleep in another room, he did not know all that happened in the front room (*id.* at 175–76).

Petitioner testified at the evidentiary hearing (Ex. HH at 180–89).  Petitioner admitted that prior to his convictions in this case, he had three prior felony convictions

(*id.* at 186).   Petitioner testified that he "somewhat" recalled the telephone conversations he had with Cathy Williams from the jail (*id.*).   He testified that Attorney Hurt, one of his defense lawyers, advised him to refrain from the telephone calls with Ms. Williams (*id.* at 186–87).

Loreno Bueno testified that she prosecuted Petitioner's case (Ex. HH at 149–51).   Ms. Bueno testified that her office attempted to locate Christopher Hughley, but was unsuccessful (*id.* at 151).   She testified,

> We kind of got the feeling that he didn't want to be involved in the process.   Partially, I think in part, we had discovered or we believe that there was a sexual relationship between Cathy Williams and the defendant in this case.   And the defendant would have been Chris Hughley's friend.   So he just kind of stayed out of the picture.

(Ex. HH at 151).   Ms. Bueno testified that Cathy Williams was "completely uncooperative" during the pre-trial process (*id.* at 152).   She testified that Williams failed to respond to an investigative subpoena that was issued for the girls to meet with the prosecutor's office (*id.*).   Additionally, Williams failed to appear for depositions scheduled by the defense (*id.*).   Ms. Bueno testified that Williams also failed to appear on the day of trial, which was originally scheduled upon the defense's speedy trial demand (*id.*).   Ms. Bueno testified that she listened to recorded telephone conversations between Petitioner and Ms. Williams while Petitioner was detained at

the jail pending trial (*id.*).  She testified that there were multiple telephone calls, at

least three (*id.* at 153).  Ms. Bueno described the conversations as follows:

> A.     Based on the phone calls, it appeared that their relationship
> had been more than just friends.  And there had been conversations
> between her and the defendant about if the children didn't come to
> testify, then the case would have to be dropped.  And it was kind of in
> code, but it was very clear.
>
> And I remember it specifically, because of the terminology,
> something along the lines of if the dogs stay in the woods, then I'm fine.
> If the dogs leave the woods and they come to court I'm going to prison.
> And he had indicated to Ms. Williams she should maybe take the girls
> fishing on the day of trial so that they wouldn't be around to be served,
> or picked up, or whatnot.
>
> Q.     Now was there at some point where the defendant and Ms.
> Williams engaged in phone sex over the jail phone calls?
>
> A.     Yes.  And that's what led me to believe they were more than
> just friends.

(Ex. HH at 152–53).  Ms. Bueno testified that she provided all of this information to

defense counsel, Attorney Hurt (*id.* at 153).  Ms. Bueno testified that Bobbie Hughley

was the brother of at least one of the victims (*id.* at 154).  She testified that the

prosecutor's office was unable to locate him for service of  a subpoena, because he

had juvenile criminal charges and a "pickup order" pending, so it appeared he was

avoiding service (*id.*).

Ms. Bueno testified that one of the victims, S.O., told her that her mother, Cathy Williams, was putting pressure on her to "not send Johnny down the river" (Ex. HH at 160).  Bueno testified that if Cathy Williams had testified that S.O. told her that she lied about Petitioner's touching her, Bueno would have impeached Williams with the jail telephone calls (*id.* at 161).

Deanna Hurt, one of Petitioner's defense attorneys at trial, testified that at the time of Petitioner's trial, she did not have experience defending a sexual battery case; therefore, a very experienced attorney, Joel Remland, assisted her at trial (Ex. HH at 189–91).  Attorney Hurt testified that prior to trial, she sent several investigators to attempt to locate Christopher Hughley, but they were unsuccessful (*id.* at 192–93).  She testified that her office spoke to Petitioner's brother, who advised them that Hughley used to work for him but resigned a couple of months prior (*id.* at 192).  Attorney Hurt testified that the telephone number listed in the police report was disconnected (*id.*).  She testified that her office left messages at the telephone number provided by Petitioner's brother, but they were never answered (*id.*).  Hurt testified that they attempted to contact Christopher Hughley at the address provided in the police report, and by contacting his former probation officer, but they were unable to find him (*id.* at 192–93).  Hurt testified that she informed Petitioner that she was

unable to locate Christopher Hughley (*id.* at 193–94). She testified that she did not recall that Petitioner asked her to call Christopher Hughley as a witness (*id.* at 193). Attorney Hurt testified that she was unaware that Christopher Hughley was at the courthouse on the day of trial (*see id.*). However, during cross-examination, and upon being shown a trial transcript, she admitted that she informed the court that she intended to call Christopher Hughley as a witness (*id.* at 201). Hurt testified that someone other than her would have gone out of the courtroom to retrieve Hughley (*id.* at 202). She testified that the transcript then indicated that she called Investigator Beck as a witness (*id.*). Hurt testified that the jury heard the substance of Christopher Hughley's testimony through the testimony of Investigator Beck (*id.* at 214–17).

Attorney Hurt testified that she was aware that Cathy Williams was in custody at the time of trial (Ex. HH at 194). She testified that she planned to call Ms. Williams as a trial witness until she listened to the recordings of telephone conversations from the jail (*id.* at 194, 202). Hurt testified that the phone calls were sexual in nature, and Petitioner and Ms. Williams discussed the victims not being present at trial (*id.*). Hurt testified that she did not think it would be helpful to the defense for the jury to hear the conversations (*id.* at 194–95). With regard to Bobbie Hughley, Attorney Hurt

testified that she would have liked to interview Hughley, but her office could not locate him (*id.* at 195).

Attorney Joel Remland testified that he was co-counsel with Attorney Hurt during Petitioner's trial (Ex. HH at 218–19).  Remland testified that he had been practicing criminal law for forty years, and had defended cases involving sex crimes against children (*id.* at 219).  Attorney Remland testified that he advised Attorney Hurt on strategy decisions, such as whether to call or not call certain witnesses (*id.* at 220–21).  With regard to the strategy of whether or not to call Christopher Hughley as a witness, Remland testified he advised Attorney Hurt as follows:

> I said we don't need to call Mr. Hughley if Mr. Beck is going to say the same thing. Because he was a police officer, I think he was in uniform and he, I think enhanced the credibility of our case because he was helping us out.  So we were calling a police officer to help our case out, which if you can call a police officer as part of your case that's always a good thing, in my opinion.

(Ex. H at 221–22).

With regard to calling Cathy Williams as a witness, Attorney Remland testified:

> [I]n this case, not only did you have—you had a girlfriend or the person who's in the relationship, it's like a domestic case with the defendant.  You also had the jail calls.
>
> Now, I didn't listen to the jail calls, Ms. Hurt did.  And I think she emphasized the fact that there was sex being discussed and this was a sex battery case.  I don't remember the composition of the jury, but that

doesn't sound real favorable, at all.  It also shows the closeness and the influence that Mr. Williams could have had over the witnesses.  If there were women on the jury I mean, it just makes things worse.

So I think it's a strategy call on our part.  Obviously, we talked about it; I was there with her during the trial and I think we decided not to call her.  She was going to be in custody; the jury is going to wonder why she's in custody.  I mean there's talk about hiding the witnesses, talking about the sexual nature of the conversations.  I mean certainly whatever she says is going to be scrutinized and probably not considered very credible.  And it would make it look worse for Mr. Williams.  So I think we considered those types of issues and we decided not to call.  It was a strategy decision not to call Cathy Williams.

I mean, like I said, even though something she said might have been favorable, there is a lot of other stuff that she said that would have been very negative.  So you have to just weight it; it's a decision that we did at the time of the trial.
. . . .
There's two sides to a coin, heads and tails.  There's the pros and there's the cons, okay?  The pro is putting the corroboration on; the con is the alleged conspiracy—if you want to call it a conspiracy, the jail phone calls, the fact that they are close to each other, the fact that the victim is in her custody, Cathy Williams, the fact that Cathy Williams told us about that letter and told us—I mean, told us about the fact that she is lying is helpful.

But then when you look at the situation, you have to say well, is Cathy Williams coercing this young 11-year-old girl to write this statement out to get the defendant's 2 charges dropped.  You have to look at it the way the jury is going to look at it.  You walk up with that letter and you would know what I'm saying and you just go ahead and put it into evidence and call Cathy Williams, and she tells you something on direct that's really great.  And you're feeling fantastic. Wow, we've got reasonable doubt.  And then you sit down.

    And then Lorena Bueno gets up there to cross examine her and
starts to play the tapes where she is having phone sex with your client,
saying that they're going to bury the witnesses and they won't show up
at trial.  That's what happens when Cathy Williams is called.  The
positive on direct is the stuff in the letter about how she made it up.  The
cross is the coercion and the conspiracy and all of that.  So the question
is when you weigh it, do the pros outweigh the cons?  Did the cons—

    We decided, Ms. Hurt and myself, after evaluating the
evidence—we decided it would be better not to put the evidence on
because it came from Ms. Cathy Williams.  And she had major
credibility problems and the case was all about credibility.  We felt we
would have a more credible case arguing the inconsistencies of the
statements as was done, instead of putting the credibility and weakening
the credibility of our own case because it's always better to
attack—attack, attack, attack—then defend your own credibility.  It's
hard to defend your own credibility when you're on the defense; it's
better to attack the credibility of the State's case . . . .

(Ex. H at 222–23, 232–34).

    The state court applied the <u>Strickland</u> standard to Petitioner's IATC claims (Ex.

HH at 239–40, Ex. II at 245).  The court adjudicated Ground 1 at follows:

    The Court found the testimony of Joel Remland, Deanna Hurt, and
Loreno Bueno to be more credible than the testimony of the other
witnesses presented.  The Court found that the evidence did not establish
that the performance of counsel fell below that expected under
<u>Strickland</u>.  Judgment calls or strategies made during the course of a trial
are the province of counsel, and second guessing after a conviction does
not establish deficient performance.  The Court does not feel that the
failure to call the three witnesses named would have resulted in an
acquittal of the Defendant.  In fact, the Court finds that presenting them
as witnesses would have seriously compromised the Defendant's case
and made the likelihood of a conviction even stronger.

(Ex. II at 245–46).  Petitioner appealed the circuit court's decision to the First DCA

(Ex. JJ).  The First DCA affirmed per curiam without written opinion (Ex. MM).

"Determining the credibility of witnesses is the province and function of the

state courts, not a federal court engaging in habeas review."  Consalvo v. Sec'y for

Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011); *see also* Gore v. Sec'y for Dep't

of Corr., 492 F.3d 1273, 1300 (11th Cir. 2007) (noting that while reviewing court also

gives a certain amount of deference to credibility determinations, that deference is

heightened on habeas review) (citing Rice v. Collins, 546 U.S. 333, 341–42, 126 S.

Ct. 969, 163 L. Ed. 2d 824 (2006) (stating that "[r]easonable minds reviewing the

record might disagree about the [witness'] credibility, but on habeas review that does

not suffice to supersede the trial court's credibility determination")).  Federal habeas

courts have "no license to redetermine credibility of witnesses whose demeanor has

been observed by the state trial court, but not by them."  Marshall v. Lonberger, 459

U.S. 422, 434, 103 S. Ct. 843,74 L. Ed. 2d 646 (1983); *see also* Baldwin v. Johnson,

152 F.3d 1304, 1317 (11th Cir. 1998); Smith v. Kemp, 715 F.2d 1459, 1465 (11th

Cir. 1983) ("Resolution of conflicts in evidence and credibility issues rests within the

province of the state habeas court, provided petitioner has been afforded the

opportunity to a full and fair hearing.").  Questions of the credibility and demeanor

of a witness are questions of fact.  *See* Consalvo, *supra* (citing Freund v. Butterworth,

165 F.3d 839, 862 (11th Cir. 1999) (en banc)).  The AEDPA affords a presumption

of correctness to a factual determination made by a state court; the habeas petitioner

has the burden of overcoming the presumption of correctness by clear and convincing

evidence.  *See* 28 U.S.C. § 2254(e).

Petitioner has failed to rebut the state court's credibility findings with clear and

convincing evidence.  Therefore, this court defers to the state court's findings that the

testimony of Joel Remland, Deanna Hurt, and Loreno Bueno was credible.

Additionally, where, as here, a state court makes a factual finding that counsel

strategically decided not to call certain witnesses, that finding is entitled to a

presumption of correctness under § 2254(e)(1).  *See* Fotopoulos v. Sec'y Dep't of

Corr., 516 F.3d 1229, 1233 (11th Cir. 2008).

> [S]trategic choices made after thorough investigation of law and facts
> relevant to plausible options are virtually unchallengeable; and strategic
> choices made after less than complete investigation are reasonable
> precisely to the extent that reasonable professional judgments support the
> limitations on investigation.  In other words, counsel has a duty to make
> reasonable investigations or to make a reasonable decision that makes
> particular investigations unnecessary.

Strickland, 466 U.S. at 690–91.  Thus, "trial counsel has not performed deficiently

when a reasonable lawyer could have decided, under the circumstances, not to

investigate or present particular evidence."  <u>Grayson v. Thompson</u>, 257 F.3d 1194,

1225 (11th Cir. 2001); *see also* <u>Wiggins v. Smith</u>, 539 U.S. 410, 523, 123 S. Ct. 2527,

156 L. Ed. 2d 471 (2003) ("[O]ur principal concern . . . is not whether counsel should

have presented a mitigation case.  Rather, we focus on whether the investigation

supporting counsel's decision not to introduce mitigating evidence of [the petitioner's]

background was itself reasonable.") (emphasis omitted).

In  reviewing  an  attorney's  professional  judgments,  "counsel  is  strongly

presumed to have rendered adequate assistance and made all significant decisions in

the  exercise  of  reasonable  professional  judgment."   <u>Strickland</u>, 466 U.S. at 690.

Indeed, as discussed *supra*, the federal court's standard is a high one—"[e]ven if many

reasonable lawyers would not have done as defense counsel did . . ., no relief can be

granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the

circumstances, would have done so." <u>Rogers</u>, 13 F.3d at 386; <u>Chandler</u>, 218 F.3d at

1315 ("And because counsel's conduct is presumed reasonable, for a petitioner to

show that the conduct was unreasonable, a petitioner must establish that no competent

counsel would have taken the action that his counsel did take.").

Reasonableness  is  assessed  objectively,  measured  "under  prevailing

professional norms," <u>Strickland</u>, 466 U.S. at 688, and includes a context-dependent

consideration of the challenged conduct as seen "from counsel's perspective at the time," *id.* at 689; *see also* <u>Hannon v. Sec'y, Dep't of Corr.</u>, 562 F.3d 1146, 1151 (11th Cir. 2009) ("The standard we apply in assessing the first prong is that of a reasonable attorney, not a paragon of the bar."); <u>Williams v. Head</u>, 185 F.3d 1223, 1236 (11th Cir. 1999) ("'[I]n retrospect, one may always identify shortcomings,' but perfection is not the standard of effective assistance."); <u>Atkins v. Singletary</u>, 965 F.2d 952, 958, 960 (11th Cir. 1992) ("Most important, we must avoid second-guessing counsel's performance. . . .  Nothing is so easy as to be wise after the event. . . .  A lawyer can almost always do something more in every case.  But the Constitution requires a good deal less than maximum performance.").  As the Eleventh Circuit said:

> In reviewing counsel's performance, a court must avoid using the distorting effects of hindsight and must evaluate the reasonableness of counsel's performance from counsel's perspective at the time. . . .  The widespread use of the tactic of attacking trial counsel by showing what "might have been" proves that nothing is clearer than hindsight—except perhaps the rule that we will not judge trial counsel's performance through hindsight.

<u>Chandler</u>, 218 F.3d at 1316–17 (quotations and citation omitted).  In other words, federal habeas courts recognize that "the trial lawyers, in every case, could have done something more or something different.  So, omissions are inevitable.  But, the issue

is not what is possible or what is prudent or appropriate, but only what is constitutionally compelled." *Id.* at 1313 (quotations omitted).

Here, the state court reasonably determined that defense counsel's strategy of not calling Christopher Hughley or Cathy Williams was reasonable, and that Petitioner was not prejudiced by defense counsel's failure to call either of them.

If Christopher Hughley had testified, only part of his testimony would have been favorable to the defense; the jury would have heard that the girls were upset with Hughley and Petitioner because they were noisy.  However, Hughley's testimony also would have been damaging.  It would have corroborated the girls' statements that Petitioner had been drinking, and that he was trying to share their blankets with them. Further, the jury would have heard that the alleged sexual touching occurred after Petitioner had argued with his girlfriend and then returned to Hughley's house to spend the night.  Additionally, Hughley's credibility would have been impeached with the fact that he had been previously convicted of eight or nine felonies.  It was thus reasonable for defense counsel to conclude that the benefits of calling Christopher Hughley as a witness were little to none.

With regard to Cathy Williams, the jury heard the substance of her favorable testimony, that S.O. recanted her allegations one week after she accused Petitioner of

improperly touching her.  The jury heard this through the testimony of S.O. herself and admission of S.O.'s written recantation into evidence (Ex. B at 48–49, 51, 53–54, Ex. EEE).  Further, Ms. Williams' testimony would have been substantially, if not completely, discredited by her recorded conversations with Petitioner while he was in jail.  Therefore, the state court reasonably concluded that Petitioner failed to demonstrate deficient performance and prejudice with regard to defense counsel's failure to call Cathy Williams.

With regard to Bobby Hughley, not only did Petitioner fail to proffer any reliable evidence of the substance of his proposed trial testimony, but Petitioner failed to show that Hughley's testimony would have been favorable to the defense.  Alishia Hughley, Bobby's sister, testified that on the night in question, she and Bobby were asleep in a back room, and S.O. came in and woke up Bobby, and then Bobby woke her (Alishia) up, and S.O. told her that Petitioner was touching her in "the wrong place" (Ex. B at 59, 61–63).  Therefore, it does not appear that Bobby Hughley's testimony would have been favorable to the defense.

Additionally, Petitioner failed to show that Bobby Hughley was willing and available to testify.  Indeed, based upon the prosecutor's testimony that Hughley had outstanding juvenile charges and a "pickup order" pending, and that it appeared he

was avoiding service, it appears unlikely that Hughley would have been available.

Therefore, the state court reasonably concluded that Petitioner failed to show deficient

performance and prejudice based upon defense counsel's failure to call Bobby

Hughley as a witness.

Petitioner failed to demonstrate that the state court's adjudication of Ground

One was based upon an unreasonable determination of the facts, or that it was contrary

to or an unreasonable application of <u>Strickland</u>.  Therefore, Petitioner is not entitled

to federal habeas relief on Ground One.

B.    <u>Ground Two:  "The defendant's counsel was ineffective for failing to
object to improper comments made by the State during closing arguments."</u>

Petitioner alleges that during closing arguments, the prosecutor improperly

bolstered the testimony of State's witnesses, improperly injected her personal opinions

into the case, and improperly shifted the burden of proof to the defense by making the

following comments:

> The fact of the matter is, there has been no evidence presented that
> contradicts the testimony of those three girls . . . .  What lack of evidence
> do we have?  We have lack of any evidence of why these children would
> make it up.  What is their motive to lie?  There has been no motive
> shown whatsoever.

(ECF No. 1 at 9–10).  Additionally, though not included in the heading of Ground

Two, Petitioner alleges defense counsel should have objected to the prosecutor's

gesture to her breasts when asking S.O. where Petitioner kissed her (*id.* at 10–12).

Respondent concedes Petitioner exhausted this claim (ECF No. 17 at 51).

Respondent contends the state court adjudicated the merits of the claim, and the

adjudication was not based upon an unreasonable determination of the facts, or

contrary to or an unreasonable application of clearly established federal law (*id.* at

51–54).

> 1.   Clearly Established Federal Law

The Strickland standard is the clearly established federal law applicable to this

claim.

> 2.   Federal Review of State Court Decision

Petitioner raised this claim as Ground 2 in his Rule 3.850 motion (Ex. CC at

14–17).  The state circuit court denied the claim on the following grounds:

> There was no improper comment made by the prosecution during
> closing.  The Court, as did counsel for the Defendant, found the closing
> argument to be proper, and not a comment on the Defendant's right to
> remain silent.
> . . . .
>     In addition, there is no merit to the argument that the Assistant
> State Attorney's gesture to her breast in asking the child where she was

touched, was prejudicial.   While out of the norm, was not [sic] prejudicial and did not prompt the child in her testimony.

(Ex. II at 246–47).   Petitioner argued this issue on appeal of the circuit court's

decision (Ex. JJ).  The First DCA affirmed the lower court's decision without written

opinion (Ex. MM).

Under Florida law, the standard for reviewing prosecutorial comments is the

following:

> Wide latitude is permitted in arguing to a jury.  Logical inferences may
> be drawn, and counsel is allowed to advance all legitimate arguments.
> The control of comments is within the trial court's discretion, and an
> appellate court will not interfere unless an abuse of such discretion is
> shown.  A new trial should be granted when it is "reasonably evident that
> the remarks might have influenced the jury to reach a more severe
> verdict of guilt than it would have otherwise done."  Each case must be
> considered on its own merits, however, and within the circumstances
> surrounding the complained-of remarks.

Breedlove v. State, 413 So. 2d 1, 8 (Fla. 1982) (quoting Darden v. State, 329 So. 2d

287, 289 (Fla. 1976)) (other citations omitted).   The prosecutor may not, however,

"'inflame the minds and passions of the jurors so that their verdict reflects an

emotional response to the crime or the defendant rather than the logical analysis of the

evidence in light of the applicable law.'"  Jones v. State, 612 So. 2d 1370, 1374 (Fla.

1993) (quoting Bertolotti v. State, 476 So. 2d 130 (Fla.1985)).   This state rule is

essentially the same as the federal due process standard governing allegedly improper

argument by the prosecution.  A prosecutor may argue both facts in evidence and reasonable inferences from those facts.  *See* <u>Tucker v. Kemp</u>, 762 F.2d 1496, 1506 (11th Cir. 1985) (citations omitted).  But if the evidence is too insubstantial to support a reasonable inference, the prosecutor's comment will be deemed improper.  *Id.* at 1507.  Prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury may reasonably draw from it and the impermissible practice of arguing suggestions beyond the evidence.  *See* <u>United States v. Simon</u>, 964 F.2d 1082, 1086 (11th Cir. 1992) (citation omitted).

Further, the prosecutor is not limited to a bare recitation of the facts; he may comment on the evidence and express the conclusions he contends the jury should draw from the evidence.  <u>United States v. Johns</u>, 734 F.2d 657, 663 (11th Cir. 1984). A prosecutor may comment on the uncontradicted or uncontroverted nature of the evidence and may point out that there is an absence of evidence on a certain issue during closing argument to the jury.  *See* <u>White v. State</u>, 377 So. 2d 1149 (Fla. 1980). Additionally, prosecutorial comment upon a general lack of defense evidence is permissible.  *See* <u>Smiley v. State</u>, 395 So. 2d 235 (Fla. 1st DCA 1981).

Attempts to bolster a witness by vouching for his or her credibility are improper "if the jury could reasonably believe that the prosecutor indicated a personal belief in

the witness' credibility."  United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir.
1991) (citing United States v. Sims, 719 F.2d 375, 377 (11th Cir. 1983)).  A jury could
believe that the prosecutor personally believed in the witness' credibility "if the
prosecutor either places the prestige of the government behind the witness, by making
explicit personal assurances of the witness' veracity, or the prosecutor implicitly
vouches for the witness' veracity by indicating that information not presented to the
jury supports the testimony."  Id. (citation omitted).  Thus, the court must examine
whether (1) the prosecutor explicitly personally assured the witness' credibility, or (2)
the prosecutor implicitly vouched for the witness' credibility by implying that
evidence not presented to the jury supports the witness' testimony.  United States v.
Castro, 89 F.3d 1443, 1457 (11th Cir. 1996) (citing Sims, 719 F.2d at 377).

However, it should be noted that "[t]he prohibition against vouching does not
forbid prosecutors from arguing credibility . . . it forbids arguing credibility based on
the reputation of the government office or on evidence not before the jury."  United
States v. Hernandez, 921 F.2d 1569, 1573 (11th Cir. 1991).  Furthermore, when the
prosecutor voices a personal opinion but indicates this belief is based on evidence in
the record, the comment is not improper.  United States v. Granville, 716 F.2d 819,
822 (11th Cir. 1983) (finding no prosecutorial misconduct where prosecutor, in effort

to support testimony of two government witnesses, only pointed to matters in evidence: the demeanor of one witness and testimony of support witnesses, as well as a tape recording corroborating the testimony of another) (citations omitted).  Likewise, a prosecutor may reply to remarks, comments or assertions made by defense counsel. *See* United States v. Young, 470 U.S. 1, 11–13, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) (when prosecutor's comments are an "invited reply" in response to defense counsel's own remarks, and he "[does] no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction") (citations omitted).

Finally, "the limits of proper argument find their source in notions of fairness, the same source from which flows the right to due process of law."  Houston v. Estelle, 569 F.2d 372, 380 (5th Cir. 1978).  "The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)).  Thus, to establish prosecutorial misconduct, a two-prong test must be satisfied:  (1) the prosecutor's comments must have been improper; and (2) the comments must have rendered the trial fundamentally unfair.  *See* Eyster, 948 F.2d at 1206 (citations omitted); Brooks v. Kemp, 762 F.2d

1383, 1400 (11th Cir. 1985) (en banc), *vacated on other grounds*, 478 U.S. 1016, 106

S. Ct. 3325, 92 L. Ed. 2d 732 (1986), *reinstated*, 809 F.2d 700 (11th Cir. 1987);

Dessaure v. State, 891 So. 2d 455, 464–65 (Fla. 2004) (an order granting mistrial is

required only when the error upon which it rests is so prejudicial as to vitiate the entire

trial, making a mistrial necessary to ensure that the defendant receives a fair trial).

During closing arguments in Petitioner's case, defense counsel argued that the

witnesses' "stories" had not been consistent, either with each other's or their own

prior statements (Ex. B at 135–41). Defense counsel further argued that S.O.'s written

recantation was direct evidence that she lied. Defense counsel argued that the girls'

inconsistent statements provided reasonable doubt, and "a reason to believe or

disbelieve" what they said. She argued:

> . . . if you ask yourself, well why are these—why are there other stories?
> S[ ] O[ ] tells the police something, she tells you her mom took her to the
> child protection place and she talked with a lady named Lisa. Later she
> writes a written statement recanting everything saying she lied.
>
> Then she comes in to court today and tells you that something did
> touch her. Again, we don't know what. We don't even know in what
> manner it touched her. Well, she told you, she's worried about her mom.
> Her mom was in jail for not bringing her to court. She wants to help her
> mom.
>
> And how can she help her mom? What could she do? She's an
> 11-year-old. Maybe she feels if she cooperates with the State, if she does
> what she thinks they want, they'll let her mom go.

. . . .
        . . . J[ ] A[ ] says Mr. Hughley never came out of the room.
Investigator Beck says no, that's not what she said.  She said he came out
of the room and gave Mr. Williams a blanket.  Which one is true?  We
don't know.  But that's doubt.  It's a reasonable doubt.  You have a
reason to believe or disbelieve what she said.  They're two completely
different statements.
. . . .
The stories don't match each other.  S[ ] O[ ] says that she was alone
with Mr. Williams.  It was just her and him.  Ms. Andrews says she
stayed on the couch the entire time.  Those stories don't match.  S[ ] O[ ]
says yes, it happened.  No, it didn't.  Yes, it did.  Those stories don't
match.  None of the stories match with each other or with even the
person telling them.  Nothing matches.

        There's doubt.  There is more than reasonable doubt in this case.
Some of the criteria the Judge will read to you on weighing the evidence
is, did the witness seem to have an accurate memory?  The stories are
different.  If the stories are different, how accurate can they be?

        Does the witnesses' testimony agree with each other?  No.  Has
pressure or threat been used against the witnesses?  Now, they might not
have been overt, if you don't testify how I want you to, they might not
have been even been real, but this is an 11-year-old girl.  And her state
of mind as to what she believed could have been she felt pressured.
Whether or not she actually was, she may have felt it.

        And, also, did they make inconsistent statements with each other?
Again, they have.  Both of them did.

(Ex. B at 135–41).

The prosecutor argued the following in rebuttal:

. . . so let's talk about J[ ] A[ ]'s inconsistent statement.  She's 14 years
old.  She gives a statement to law enforcement and she says— everything

is consistent.  There's some bickering about whether the hand was moving on her butt or not.  An issue about whether she slept on the couch, she went back.  We talked with J[ ] A[ ].  She had not ever been given her statements to review.  She was telling you what she remembered.

And, in fact, the original statement that she gave to Investigator Beck was that she went in the back room.  And S[ ] O[ ] said, no, I was by myself.  She got up and she left.  So, she told you what she remembered today.  The question is, is there a reasonable doubt as to the elements of what happened?  She never changed her story about the fact that he touched her on the butt multiple times, or about what was said.

There was something about a kitchen.  I don't know about the kitchen.  Because nowhere in any of her statements to law enforcement did J[ ] A[ ] say anything about a kitchen.  Nothing.  She gets up, she goes in the back.  S[ ] O[ ] is left there by herself.  She is 11 years old.  You have to see her on the stand and how comfortable she was talking about it and what she had to talk about.  And she said, something touched me on my backside.  She wouldn't go in to anymore detail about it.  But it was enough for her to hop up and run into the back room and go tell her brother and her sister, at which point the defendant follows her in and says, no, no, no, come back and lay out there.

And her sister, Alicia [Hughley], says no, she's staying with me.  She's my sister.  And then conflicting statements?  S[ ] O[ ] and Alicia Hughley are both consistent in the fact that at that point the defendant kisses her on her chest.  Lewd or lascivious intent?  What is the purpose of a grown man kissing a little girl on her chest, if it's not lewd or lascivious?

In order to find that that wasn't lewd or lascivious, there would have to be some—I mean, it's not a football coach.  There is no reason that a grown man needs to be touching a little girl like that.  He kissed her on her chest.  There has been no conflict on that.  And he says, I'm

sorry, I thought I was home.  Home with his wife?  Home with his girlfriend?  We don't know.

*The fact of the matter is, is that there has been no evidence presented that contradicts the testimony of those three girls.*  Let's talk about motive now.  A lot has been made about well, S[ ] O[ ] is 11 years old and she might think or she might feel that if she testifies one way or another that this is going to help her mother out.

She told you that her mom is in jail.  And her mom is in jail because she didn't bring her to court.  And she was asked, you know, about that statement that she made when her mother brought her to Ms. Hurt's office and had her fill out that statement saying it was a lie.

I asked her, what is this?  The first thing out of her mouth, that piece of paper that you're going to have to take back with you.  She didn't say it was my statement.  She didn't say it was this.  She said, it's a lie.  Why?  Why did you do that?  Well, my mom didn't want Johnny Williams to get in trouble and go down the river for a long time.

I would submit to you S[ ] O[ ] was doing what her mother asked her to do.  Has anyone been affected, has been threatened or pressured?  S[ ] O[ ].  We talked about the fact that she was worried that if she came in here and told the truth that her mother would be upset with her.  And we talked about the fact that it was okay to go ahead and tell the truth.  And that the only person who had asked her to lie was her mother.

We don't know the motive.  We don't know the reasons.  That's speculative, that's imaginary.  It is not relevant.  The fact of the matter is, what is relevant is what happened.  We talked about this in jury selection, the State is not going to answer every single question you have.  The State does not have a crystal ball.  We do not go into the minds of people and we cannot tell you why people do things.  There is not an answer for that.  Sometimes there is no evidence, there is no rhyme nor reason.

The fact of the matter is, S[ ] O[ ] got up there and she told you what happened.  And no one was able to impeach her with a previous statement that she gave to CPT.  All they could do was talk about this letter that her mom made her write.

J[ ] A[ ] as very consistent.  Her testimony was consistent, so she thinks she slept on the couch, or she went in the back room.  Is that enough to have reasonable doubt as to what Mr. Williams did?

Look at everything that happened on that night.  Don't leave your common sense at the door.  I mean, it's got to be accident, after accident, after lying, after lying.  Everyone is at fault except for Mr. Williams.

You want lewd or lascivious—evidence of lewd or lascivious intent?  Listen to the statements that Mr. Williams made to those kids.  Soon as Alicia Hughley saw what happened and went to go get her mom, where was Mr. Williams?  He was gone.  He was out of that house.

The defense wants you to speculate, well, he didn't want to have problems.  Well, there is no evidence of that.  And the court is going to tell you, you can't speculate.  You can't come up with an imaginary or forced doubt.  All of the proof and all of the things that you use to make a decision are what you have heard in the form of evidence, as in testimony from the witnesses.  Not argument by defense counsel or by State.  By what has come out on this witness stand.

*What lack of evidence do we have?  We have lack of any evidence of why these children would make it up.  What is their motive to lie? There has been no motive shown whatsoever.*  In fact, I would submit to you that there's been no evidence of any material contradiction.  If those kids got up there and were one hundred percent on every single detail, had sat and reviewed their statements, I would submit to you that the argument would be, well, they were coached.  They're kids.  They're 14, 14, and 11 when this happens.  They're 15, 15 and 12.  They're kids.

> Has any pressure or threat been used against a witness that affected the truth of the witnesses' testimony? The only evidence of any pressure or threat has been on S[ ] O[ ] by her mother.  The fact of the matter is, is what you have in front of you is uncontroverted evidence that John Williams touched S[ ] O[ ] and J[ ] A[ ].

(Ex. B at 141–47) (emphasis added to identify comments which Petitioner alleges were objectionable).

At the post-conviction evidentiary hearing, Attorney Hurt and Attorney Remland both testified that they did not think that the prosecutor's arguments were improper, because the defense pursued the theory that the girls' stories were inconsistent and contradictory, and the comments were in rebuttal to Hurt's arguments to that effect (Ex. HH at 196–97, 226–27).

Upon review of the evidence adduced at trial and the entirety of the arguments of the prosecutor and defense counsel during closing arguments, the undersigned concludes—as did the state circuit court and the First DCA—that Petitioner failed to show that defense counsel's failure to object to the comments he identified constituted deficient performance, or that there is a reasonable probability the outcome of trial would have been different had counsel objected.

The same is true with regard to Petitioner's claim that defense counsel should have objected to the prosecutor's gesture to her breasts when asking S.O. to clarify where Petitioner kissed her.  The context of the gesture was the following:

> Q [by the prosecutor].      And what happened after Uncle Johnny followed you in the back room.
>
> A.      He turned on the light and then he said, I'm sorry [then] he had kissed me on the chest.
>
> Q.      Kissed you on the chest.  And when you say the chest, can you point to where you mean?  Is it this part of your body? (INDICATING)
>
> A.      Uh-huh.  Yes.

(Ex. B at 47–48).

Alishia Hughley testified to the same event as follows:

> Q [by the prosecutor].      . . . And at some point, did Johnny come into that back bedroom?
>
> A.      Yes.
>
> Q.      What happened when he got back there?
>
> A.      He said she can sleep in the front room.  And I was like, no, she stay back here with me.  Then he kind of kissed her right there.
>
> Q.      On her chest?
>
> A.      Uh-huh.

> Q.     Is that a yes?
>
> A.     Yes.

(Ex. B at 63).

The prosecutor, Loreno Bueno, explained her gesture at the post-conviction

evidentiary hearing:

> Q [by counsel for the State].     . . . there was some point where
> the victim was not being very descriptive, as to what took place.  Is that
> correct?
>
> A.     Yes.  There was a question about when he had either
> touched her or kissed her on her chest.  And at the age that she was in her
> developmental stage you know, her chest is not something she was able
> to describe or it wasn't something visible at that point.  So I had asked
> her specifically when she said chest, did she mean and I placed my hands
> on my own breasts.  And she said, yes.
> . . . .
> Q [by Petitioner's counsel].     Okay.  And also you did, I think
> as you just mentioned, a gesture on your own chest—
>
> A.     I did.
>
> Q.     —where the touching occurred.  Am I correct?
>
> A.     Yes.  She had indicated it was on her chest.  And I asked her
> when you said your chest, do you mean—and then I placed my hands on
> my breasts.
>
> Q.     Okay.  And you would agree without that, a chest could
> have been here [gesturing], which would have been nonsexual. Am I
> correct?

   A. Which [is] why I had to ask her specifically because unfortunately, at this point she wasn't wearing a bra, she didn't have breasts.  It's not like when you talk about your lower privates where I can ask you if it's where you go pee or where you go poo.  You are limited in the ways that you can do it.  I can use a doll, I can use drawings.  My hands were what I used at that point.  Unorthodox, yes, but it was a yes or no question which she could agree or disagree.

   Q. Okay.  And it a question in which you were basically providing the answer, which you wanted.  Am I correct?

   A. No.  I was asking her specifically if this is the area she was referring to.  I wasn't telling her what I wanted her to say, I was asking her yes or no, which is not a leading question.

   Q. And you didn't gesture on her, who you say is flat chested, you gestured on yourself who is mature?

   A. Yes.

(Ex. HH at 158)

   Attorney Hurt testified that she did not think that the prosecutor's touching her own chest was improper (Ex. HH at 210).

   Petitioner failed to rebut, with clear and convincing evidence, the state court's finding that the prosecutor's gesture did not prompt S.O. in her testimony. Additionally, Petitioner failed to demonstrate that defense counsel had a meritorious basis for objecting to the gesture, or that there is a reasonable probability the outcome of trial would have been different if defense counsel had objected to the gesture.

Petitioner failed to show that the First DCA's adjudication of the claims asserted in Ground Two was contrary to or an unreasonable application of <u>Strickland</u>. Therefore, he is not entitled to relief on Ground Two.

      C.    <u>Ground Three:  "The defendant's [counsel] was ineffective for failing to properly impeach state witness S.O. with statements she made to the police."</u>

          <u>Ground Four:  "The defendant's counsel was ineffective for failing to properly impeach state witness J.A. with statements she made to the police."</u>

Petitioner asserts defense counsel was ineffective for failing to impeach the victims with prior statements they made to investigators (ECF No. 1 at 13–15, 17–19). With regard to S.O., Petitioner alleges that during trial, she testified as follows:  that Petitioner came to the house during the day; that he got on the floor and got under the same cover as her; that she thought she felt something hit her backside; that she got up and went to the back room where her brother and sister were; that Petitioner followed her and told her that he was sorry and kissed her on the chest; and that Petitioner left (*id.* at 14).  Petitioner contends defense counsel should have impeached S.O.'s testimony with her prior statement to investigators, in which she stated the following:  that Petitioner came to the house after everyone was asleep; that she was the only person who woke up; that Petitioner "came off the chair" and "started feeling" on her; that Petitioner tried to pull her pants down, but she pulled them back

up; that Petitioner felt her bottom; and that the touching occurred on top of her clothes (*id.*).

With regard to J.A., Petitioner alleges she testified during trial that Petitioner and Christopher Hughley came into the house together, and Petitioner laid on the floor (ECF No. 1 at 18). However, J.A. told police that Petitioner drove up in the yard and woke up Chris Hughley, who was on the couch, and Petitioner told Hughely to "go in there" and go to sleep (*id.*).

Respondent concedes that Petitioner exhausted both claims in the state courts (ECF No. 17 at 54–55, 57). Respondent contends the state court adjudicated the merits of the claims, and the adjudications were not based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of clearly established federal law (*id.* at 55–58).

1.   Clearly Established Federal Law

The Strickland standard is the clearly established federal law applicable to this claim.

2.   Federal Review of State Court Decision

Petitioner raised these claims as Ground 3 and 4 in his Rule 3.850 motion (Ex. CC at 17–22). The state circuit court adjudicated the claims as follows:

> [T]he cross examination of the State's witnesses was conducted effectively and competently.  It is always easy to look from hindsight and find other issues that could have been argued.  No counsel tries a perfect case, and as such, is always subject to the jaundiced eye of one convicted and sentenced to prison.  However, the Court feels that the arguments made herein were proper and effective. Numerous inconsistencies were brought out by the State and Defendant that created an opportunity for the Defendant to be acquitted.  Simply because he was not is not the basis for ineffective assistance.

(Ex. II. at 246).  Petitioner argued these issues on appeal of the circuit court's decision (Ex. JJ).  The First DCA affirmed the lower court's decision without written opinion (Ex. MM).

The trial transcript demonstrates that defense counsel brought out the inconsistencies between J.A.'s trial testimony and her statement to Investigator Beck during counsel's questioning of both of them (Ex. B at 35–36, 112–13, 115–17, 121). With regard to S.O., defense counsel reasonably chose the strongest method of impeachment by admitting into evidence S.O.'s handwritten note recanting her allegations (Ex. B at 53–54, Ex. EEE).  Additionally, defense counsel focused her closing argument on the inconsistencies in the girls' descriptions of the events.

The state court reasonably concluded that defense counsel was not deficient in her impeachment of the victims.  Therefore, Petitioner failed to demonstrate that the

state court's adjudication of Grounds Three and Four was contrary to or an unreasonable application of <u>Strickland</u>.

    D.   <u>Ground Five: "The defendant's counsel was ineffect [sic] for failing to file a motion for judgment of acquittal, and/or motion for new trial on Count 2 when the conviction is based upon legally insufficient evidence and is not supported by the greater weight of the evidence, which prejudiced the defendant."</u>

Petitioner asserts defense counsel made a motion for judgment of acquittal ("JOA") and a motion for new trial as to Count I, but failed to do so as to Count II (ECF No. 1 at 21–22). Petitioner contends this constituted ineffective assistance (*id.*).

Respondent concedes Petitioner exhausted this claim in the state courts (ECF No. 17 at 58). Respondent contends the state court adjudicated the merits of the claim, and the adjudication was not based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of clearly established federal law (*id.* at 59–61).

    1.   <u>Clearly Established Federal Law</u>

The <u>Strickland</u> standard is the clearly established federal law applicable to this claim.

    2.   <u>Federal Review of State Court Decision</u>

Petitioner raised this claim as Ground 5 of his Rule 3.850 motion (Ex. CC at

22–26).  The state court adjudicated the claim as follows:

> The Court finds that the Motion for Judgment of Acquittal and
> New Trial were properly addressed.  Judge Dekker [the trial judge] made
> it abundantly clear that she felt there was more than enough evidence for
> Count 2 to go to a jury.  There was legally sufficient evidence presented,
> and by far the greater weight of the evidence supported the jury verdict.

(Ex. II at 247).

The victim of Count II was J.A. (*see* Ex. A at 1).  At trial, J.A. testified that on

the night in question, she was at her aunt's (Cathy Williams') house (Ex. B at 28–29).

She testified that her cousins, S.O., Alishia, and Byron, were also there (*id.*).  J.A.

testified that she and S.O. were in the living room (*id.* at 29).  J.A. testified that she

was lying on the couch under a cover, and Petitioner laid on the floor right beside the

couch (*id.* at 30–31).  J.A. testified that she turned around, and Petitioner asked her

how old she was (*id.* at 31).  J.A. testified she told Petitioner she was 14, and he said

she was "too young" (*id.*).  J.A. testified that Petitioner then "got under the cover on

the floor and he started touching on me," specifically, on her butt (*id.*).  J.A. testified

that she told him to stop, but he didn't (*id.*).  She testified that he touched her on her

but three or four times (*id.* at 31–32).  J.A. testified that Petitioner got up and left, but

she stayed on the couch and decided to tell her aunt (Ms. Williams) about it after her

aunt woke up (*id.* at 32).  J.A. testified that she went to sleep, but was awakened by her aunt's "fussing" (*id.*).  J.A. testified, "Then I know that my cousin had told her what happened, so I told her that he was touching on me, too." (*id.*).

At the conclusion of the State's evidence, defense counsel moved for a JOA (Ex. B at 76–81).  Attorney Hurt addressed both counts, stating that with respect to the allegations involving J.A. (Count II), "I don't believe that she stated in any way that she felt it was in—she'd been touched in a sexual manner" (*id.* at 76).  In denying the motion for JOA, the trial court ruled, "[A]s to Count 2, I think there's easily sufficient evidence to go to the jury" (*id.* at 77–78).  After Petitioner was convicted as charged of Count I, and convicted of the lesser offense of attempt as to Count II, defense counsel filed a written motion for JOA or, in the alternative, motion for new trial, as to Count I (Ex. A at 41–43, 44–46).  The court held a hearing on the motion (Ex. G), after which the court denied the motion (Ex. A at 51).

At the post-conviction evidentiary hearing, Attorney Hurt testified that the trial judge was "pretty adamant" in her ruling that there was sufficient evidence to submit Count II to the jury (Ex. HH at 198–200).  Hurt testified that she did not believe that the judge would have granted the motion if she had argued it any differently or renewed it (*id.* at 198–99).

In Florida, "[a] trial court should not grant a motion for judgment of acquittal 'unless there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law.'"  Jackson v. State, 25 So. 3d 518, 531 (Fla. 2009) (quoting Coday v. State, 946 So. 2d 988, 996 (Fla. 2006)).  "In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Simmons v. State, 934 So. 2d 1100, 1111 (Fla. 2006) (quoting Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)).

Viewing the evidence in the light most favorable to the State, including the testimony of J.A., a rational trier of fact could have found beyond a reasonable doubt that Petitioner attempted to unlawfully and intentionally touch J.A.'s buttocks, or the clothing covering them, in a lewd or lascivious manner.  Therefore, it was proper to submit the issue to the jury, and there was no reasonable probability that the trial court would have granted the motion for a JOA if counsel had argued it differently or raised it again in a renewed motion for JOA or motion for new trial.

Moreover, the state court has already answered the question of whether a motion for JOA would have been properly granted if defense counsel had argued it

differently or renewed it after trial—it would not.  This court must defer to the state

court's determination of state law.  *See* <u>Alvord v. Wainwright</u>, 725 F.2d 1282, 1291

(11th Cir. 1984) (explaining, in the context of an ineffective assistance of appellate

counsel claim, that "[o]n the one hand, the issue of ineffective assistance—even when

based on the failure of counsel to raise a state law claim—is one of constitutional

dimension," but, "[o]n the other hand, the validity of the claim [counsel] failed to

assert is clearly a question of state law, and we must defer to the state's construction

of its own law.") (citations omitted)[6]; *see also* <u>Callahan v. Campbell</u>, 427 F.3d 897,

932 (11th Cir. 2005) (holding that defense counsel cannot be deemed ineffective for

failing to make a state-law-based objection when the state court has already concluded

that the objection would have been overruled under state law; to conclude otherwise

would require the federal habeas court to make a determination that the state court

misinterpreted state law, which would violate the fundamental principle that federal

habeas courts should not second-guess state courts on matters of state law); <u>Herring</u>

<u>v. Sec 'y Dep't of Corr.</u>, 397 F.3d 1338, 1354–55 (11th Cir. 2005) (denying federal

habeas relief on ineffective assistance claim based on counsel's failure to make state

law-based objection; holding that the Florida Supreme Court's conclusion that the

---

[6] <u>Alvord</u> was superseded by statute on other grounds as noted in <u>Hargrove v. Solomon</u>, 227
F. App'x 806 (11th Cir. 2007).

proposed objection would have been overruled was binding and precluded federal

habeas relief on the ineffective assistance claim:  "The Florida Supreme Court already

has told us how the issues would have been resolved under Florida state law had

[petitioner's counsel] done what [petitioner] argues he should have done . . . .  It is a

'fundamental principle that state courts are the final arbiters of state law, and federal

habeas courts should not second-guess them on such matters.'") (alterations in

original) (quoting Agan v. Vaughn, 119 F.3d 1538, 1549 (11th Cir. 1997)).

 Petitioner failed to demonstrate that the state court's adjudication of this IATC

claim was based upon an unreasonable determination of the facts, or that it was

contrary to or an unreasonable application of Strickland.  Therefore, Petitioner is not

entitled to federal habeas relief on Ground Five.

 E. Ground Six:  "The defendant avers that Judge Sheffield abused his
 discretion and denied him procedural due process by failing to make a complete
 and adequate findings of fact and conclusions of law for an meaningful [sic]
 appellate review when the trial court denied the defendant's claims on how he
 felt and not based upon any competent substantial evidence by failing to
 reference to [sic] any portions of the record.  His decision resulted in a decision
 contrary to clearly established federal law that was based on an unreasonable
 determination of the facts in light of the evidence presented in the state court
 proceeding."

 Petitioner contends the post-conviction court violated his procedural due

process rights by failing to follow Florida's procedural rules governing post-

conviction proceedings (ECF No. 1 at 23–24).  Petitioner specifically contends the state post-conviction court (1) failed to make complete and adequate findings of fact and conclusion of law that were sufficient to enable Petitioner to obtain meaningful appellate review of the court's decision denying his Rule 3.850 motion, and (2) failed to reference portions of the record that supported its decision (*id.*).  Petitioner additionally contends the state court applied an incorrect standard with regard to the prejudice prong of <u>Strickland</u> (*id.* at 24).

Respondent contends Ground Six raises a purely state law issue, and does not present a federal claim; therefore, it does not provide a basis for federal habeas relief (ECF No. 17 at 34–35).  Respondent additionally contends Petitioner failed to properly exhaust Ground Six, because he failed to properly present it to the state courts (*id.* at 35–37, 62).

In Petitioner's reply, he contends he exhausted this claim by presenting it in his initial brief on appeal of the circuit court's decision denying his Rule 3.850 motion (ECF No. 24 at 21–26).

Petitioner's due process challenge concerns the State of Florida's application of its own post-conviction procedures, not the legality of Petitioner's detention.  Under 28 U.S.C. § 2254, a petitioner can file a federal habeas challenge to a state

court judgment "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The Supreme Court has commented that "habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement."  Preiser v. Rodriguez, 411 U.S. 475, 490, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973).  Federal habeas relief is available to remedy defects in a defendant's conviction and sentence, but "an alleged defect in a collateral proceeding does not state a basis for habeas relief."  Quince v. Crosby, 360 F.3d 1259, 1262 (11th Cir. 2004); *see also* Alston v. Dep't of Corrs., Fla., 610 F.3d 1318, 1325 (11th Cir. 2010); Carroll v. Sec'y, DOC, 574 F.3d 1354, 1365 (11th Cir. 2009) (collecting cases).  There is a valid reason behind this principle:  "[A] challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment—i.e., the conviction itself—and thus habeas relief is not an appropriate remedy."  Carroll, 574 F.3d at 1365.  Furthermore, such challenges often involve issues of state law, and "[a] state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved."  McCullough v. Singletary, 967 F.2d 530, 535 (11th Cir. 1992).  Therefore, Petitioner's due process

challenges to the procedures employed by the state court in the post-conviction proceeding do not provide a basis for federal habeas relief.

Petitioner's claim that the state court applied an incorrect prejudice standard under Strickland is also unavailing.  The Supreme Court described the prejudice standard as requiring a defendant to show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Strickland, 466 U.S. at 687.  The Eleventh Circuit has described Strickland's prejudice prong as requiring a petitioner to show that "the deficient performance prejudiced the defense such that petitioner was deprived of a fair trial."  Dill v. Allen, 488 F.3d 1344, 1354 (11th Cir. 2007) (citing Strickland, 466 U.S. at 687); *see also* Ray v. Ala. Dep't of Corr., 809 F.3d 1202, 1208 (11th Cir. 2016) ("To succeed on the prejudice prong of a Strickland claim, petitioner must show that the deficiency in counsel's performance deprived him of a fair trial, such that there has been a breakdown in the adversarial process that our system counts on to produce just results.").

Here, the state post-conviction court described the prejudice prong as requiring a defendant to show that "the deficient performance prejudiced the defense to such an extent that they [sic] deprived the defendant of a fair trial" (Ex. HH at 239–40, Ex. II at 245).  The state court did not apply a rule that contradicts Strickland.  Therefore,

Petitioner failed to demonstrate that the state court's adjudication of his post-conviction claims was contrary to <u>Strickland</u>.  Petitioner is not entitled to federal habeas relief on Ground Six.

> F.    <u>Ground Seven:   "The cumulative effect of counsel's deficient
> performance prejudiced the defendant."</u>

Petitioner contends that the combined or cumulative effect of trial counsel's errors produced a fundamentally flawed trial and undermines confidence in the jury's verdict (ECF No. 1 at 26).

Respondent concedes Petitioner exhausted this claim in the state courts (ECF No. 17 at 63).  Respondent contends the Supreme Court has not recognized the cumulative error doctrine in the context of ineffective assistance of counsel claims (*id.* at 64).  Respondent further contends that none of the alleged errors of trial counsel, considered alone, approaches the threshold standard of ineffective assistance of counsel, and, taken together, their cumulative effect also falls far short of depriving Petitioner of effective assistance of counsel or a fundamentally fair trial (*id.* at 64–66).  Therefore, Petitioner failed to show that the state court's adjudication of the claim was contrary to or an unreasonable application of clearly established federal law (*id.* at 64–68).

Petitioner raised this "cumulative effect" claim in his Rule 3.850 motion (Ex. CC at 26–27).  The state court denied the claim on the ground that there could be no cumulative effect of error, because Petitioner failed to show that counsel performed deficiently with respect to any of the individual errors he alleged (Ex. II at 247). Petitioner presented this claim to the First DCA in his post-conviction appeal (Ex. JJ). The First DCA affirmed the lower court's decision (Ex. MM).

In rejecting a similar "cumulative error" argument made by a § 2254 habeas petitioner, the Eleventh Circuit stated:  "The Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim."  Forrest v. Fla. Dep't of Corr., 342 F. App'x 560, 564 (11th Cir. 2009) (per curiam) (unpublished but recognized for persuasive authority). The Forrest panel further noted "[h]owever, the Supreme Court has held, in the context of an ineffective assistance claim, that 'there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.'"  Id. at 564–65 (quoting United States v. Cronic, 466 U.S. 648, 659 n.26, 104 S. Ct. 2039, 80 L .Ed. 2d 657 (1984)).

In light of <u>Cronic</u> and the absence of Supreme Court precedent applying the cumulative error doctrine to claims of ineffective assistance of counsel, the state court's rejection of Petitioner's claim was not contrary to or an unreasonable application of clearly established federal law.  *See* <u>Wright v. Van Patten</u>, 552 U.S. 120, 126, 128 S. Ct. 743, 169 L. Ed. 2d 583 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established federal law."); <u>Schriro v. Landrigan</u>, 550 U.S. 465, 478, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007) (the Arizona Supreme Court did not unreasonably apply federal law because "we have never addressed a situation like this"); <u>Reese v. Sec'y, Fla. Dep't of Corr.</u>, 675 F.3d 1277, 1287–88 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law."); *see also* <u>Morris v. Sec'y, Dep't of Corr.</u>, 677 F.3d 1117, 1132 (11th Cir. 2012) (refusing to decide whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an

unreasonable application of clearly established law).  Therefore, Petitioner is not entitled to relief on Ground Seven.

G.    Claims Asserted in Reply Brief

In Petitioner's reply to Respondent's Answer, Petitioner appears to raise three additional grounds for relief, specifically, the issues he presented on direct appeal of his conviction:  (1) the trial court erred in denying his request for a jury instruction on the lesser included offense of simple battery, (2) the trial court erred in denying his motion for JOA on Count I, because the State failed to introduce competent substantial evidence to establish that he touched S.O. on her buttocks or her breast area in a lewd or lascivious manner, and (3) Petitioner's life sentence imposed on Count I violated his constitutional right to be free from cruel and unusual punishment (ECF No. 24 at 4–12).  Petitioner contends he exhausted each of these claims by raising them in his initial brief on direct appeal of his conviction (*id.* at 7, 10).

Respondent did not address any of these claims in its answer (including whether any of the claims were unexhausted), because Petitioner asserted them for the first time in his reply.

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C.

§ 2254(b)(1),[7] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as

---

[7] Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
        (A)  the applicant has exhausted the remedies available in the courts of the State; or
            (B) (i)  there is an absence of available State corrective process; or
              (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.

In announcing that "the substance of a federal habeas corpus claim must first be

presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the contention

that the petitioner satisfied the exhaustion requirement by presenting the state courts

only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general

appeal to a constitutional guarantee as broad as due process to present the "substance"

of such a claim to a state court.  In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276,

74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a

jury instruction violated due process because it obviated the requirement that the

prosecutor prove all the elements of the crime beyond a reasonable doubt.  *Id.*, 459

U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39

(1979)).  The only manner in which the habeas petitioner cited federal authority was

by referring to a state court decision in which "the defendant . . . asserted a broad

federal due process right to jury instructions that properly explain state law."

Anderson, 459 U.S. at 7.  The Court expressed doubt that a defendant's citation to a

state-court decision predicated solely on state law was sufficient to fairly apprise a

reviewing court of a potential federal claim merely because the defendant in the cited

case advanced a federal claim.  *Id.*, 459 U.S. at 7 & n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364 (1995).  The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[8]  The Supreme Court explained,"[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  Duncan, 513 U.S. at 365-66.

The Supreme Court again focused upon the requirement of "fair presentation" in Baldwin v. Reese, 541 U.S. 27 (2004), holding that  "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a

---

[8] The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

petition or a brief (or a similar document) that does not alert it to the presence of a

federal claim in order to find material, such as a lower court opinion in the case, that

does so."  Baldwin, 541 U.S. 27, 124 S. Ct. 1347, 158 L. Ed. 2d 64 (2004).  The

Baldwin Court commented that "a litigant wishing to raise a federal issue can easily

indicate the federal law basis for his claim in a state-court petition or brief, for

example, by citing in conjunction with the claim the federal source of law on which

he relies or a case deciding such a claim on federal grounds, or by simply labeling the

claim 'federal.'"  Id.  With regard to this statement, the Eleventh Circuit stated in

McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor
> indeed for petitioners seeking to establish exhaustion.  However, we
> agree with the district court that this language must be "applied with
> common sense and in light of the purpose underlying the exhaustion
> requirement[:] 'to afford the state courts a meaningful opportunity to
> consider allegations of legal error without interference from the federal
> judiciary.'"McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting
> Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d
> 598 (1986)).  This is consistent with settled law established by the
> Supreme Court. . . .  We therefore hold that "'[t]he exhaustion doctrine
> requires a habeas applicant to do more than scatter some makeshift
> needles in the haystack of the state court record.'"

416 F.3d at 1302–03 (citations omitted).[9]

---

[9] In  his initial brief before the Court of Criminal Appeals, the petitioner cited one federal
case in a string citation containing other state cases, and in a closing paragraph in his argument that
extraneous materials were considered by the jury during deliberations, stated that there was a

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999).

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim. Tower, 7 F.3d at 210; Parker, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)). To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the

---

violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. Id.

petitioner must show that it is more likely than not that no reasonable juror would have convicted him." Schlup, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.* Although a habeas petitioner asserting a convincing claim of actual innocence need not prove diligence to overcome a procedural bar, timing is a factor relevant in evaluating the reliability of a petitioner's proof of innocence. *See* McQuiggin v. Perkins, — U.S. —, 133 S. Ct. 1924, 1935, 185 L. Ed. 2d 1019 (2013). As the Court stated in Schlup, "[a] court may consider how the timing of the submission and the likely credibility of [a petitioner's] affiants bear on the probable reliability of . . . evidence [of actual innocence]." 513 U.S. at 332; *see also* House, 547 U.S. at 537.

Here, the state court record demonstrates that in Petitioner's brief on direct appeal of his conviction, he argued as Issue I that the trial court erred by denying his request for a jury instruction on the lesser included offense of simple battery (Ex. M at 11–13). Citing Florida law, he argued that the trial court was obligated to instruct on any lesser included offense if all the elements of the lesser offense were alleged in the accusatory pleadings, and there was some evidence adduced at trial to support the

lesser offense (*id.*).  Petitioner argued that the trial court erred in concluding that the information did not allege the "against the will" element of battery, and Petitioner was thus not entitled to a jury instruction on battery (*id.*).  Petitioner framed his claim of trial court error in terms of state law without making any reference to federal law, and in the body of his argument he made no reference to the United States Constitution or federal law, and he cited no federal cases.  He argued Florida law only.  Nothing in Petitioner's brief put the state court on notice that the issue was being presented as a federal constitutional claim.  Therefore, the undersigned concludes that Petitioner's claim of trial court error with respect to the denial of Petitioner's request for a jury instruction on the lesser included offense of battery was not fairly presented to the state courts as a federal constitutional claim and is thus unexhausted.[10]

Similarly, Petitioner did not fairly present the state courts with a federal claim concerning the trial court's denial of his motion for JOA.  In Petitioner's brief on direct appeal of his conviction, he argued as Issue II that the trial court erred by denying his motion for JOA, because the State failed to introduce competent

---

[10] The State did not waive the exhaustion requirement.  "A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement."  28 U.S.C. § 2254(b)(3).  Here, Respondent did not expressly waive the exhaustion requirement as to the new claims asserted in Petitioner's reply.  Indeed, Respondent was not even on notice of the claims, since Petitioner did not raise them in his petition, and asserted them for the first time in his reply after Respondent filed its answer.

substantial evidence to establish that he touched S.O. on her buttocks or her breast area in a lewd or lascivious manner (Ex. M at 14–16).  Petitioner's narrow argument focused on the lack of any testimony that Petitioner ever actually kissed S.O.'s breasts (*id.*).  In his brief, he framed his claim of trial court error in terms of state law without making any reference to federal law, and in the body of his argument he made no reference to the United States Constitution or federal law, and he cited no federal cases.  He argued Florida law only.  Nothing in Petitioner's brief put the state court on notice that the issue was being presented as a federal constitutional claim.  Therefore, the undersigned concludes that Petitioner's claim of trial court error with respect to the denial of the motion for JOA was not fairly presented to the state courts as a federal constitutional claim and is thus unexhausted.  *See, e.g.*, Ramos v. Sec'y, Dep't of Corr., 441 F. App'x 689, 696–97 (11th Cir. 2011) (unpublished but recognized for persuasive authority)  (petitioner's federal sufficiency of evidence claim was not exhausted where petitioner made only passing reference to federal constitutional right to due process in arguing that trial court improperly denied motion for judgment of acquittal because State failed to sufficiently prove premeditation element of murder); Pearson v. Sec'y,  Dep't of Corr., 273 F. App'x 847, 850 (11th Cir. 2008) (unpublished) (petitioner's federal sufficiency of evidence claim was not

exhausted where petitioner cited exclusively to Florida cases in state court and addressed Florida law in all of his substantive arguments, even though Florida courts assess sufficiency of evidence under standard identical to federal standard); Cook v. McNeil, 266 F. App'x 843, 845–46 (11th Cir. 2008) (unpublished) (petitioner did not alert the state court to the alleged federal nature of his sufficiency of the evidence claim and therefore failed to exhaust his federal due process claim; even though petitioner moved for judgment of acquittal and although Florida courts assess the sufficiency of the evidence under the standard applied in Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 2798, 61 L. Ed. 2d 560 (1979), petitioner cited exclusively to the state cases and all of his substantive arguments addressed Florida law; "the tenor of [petitioner's] narrow arguments that challenged the characterization of his knife and the sequence of his actions under the Florida statute did not bring a federal claim about due process to the attention of the state appellate court."). *But see* Mulinix v. Sec'y for Dep't of Corr, 254 F. App'x 763 (11th Cir. 2007) (unpublished) (petitioner's federal sufficiency of evidence claim was exhausted where petitioner presented identical argument to state and federal courts, and Florida courts' sufficiency of evidence standard was identical to federal standard).

As discussed *supra*, to overcome a procedural default such that this court may consider the merits of his claims, Petitioner must show cause for the default and prejudice resulting therefrom or a fundamental miscarriage of justice.  Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  Although ineffective assistance of counsel which rises to the level of a constitutional deprivation can serve as cause for purposes of a procedural default analysis, the issue of ineffective assistance must first be presented as an independent state claim and exhausted in the state courts.  Murray, 477 U.S. at 488; Orazio v. Dugger, 876 F.2d 1508 (11th Cir. 1989).  In Florida, a claim of ineffective assistance of appellate counsel is actionable in a petition for writ of habeas corpus filed in the appellate court to which the appeal was taken.  *See* Fla. R. App. P. 9.141(d); Davis v. State, 875 So. 2d 359, 372 (Fla. 2003).

Here, Petitioner presented two claims of ineffective assistance of appellate counsel to the First DCA (*see* Exs. T, U); however, he did not argue in either of those claims that his appellate counsel was ineffective for failing to present Issues I and II of his appellate brief as federal constitutional claims (*see id.*).  Therefore, Petitioner may not assert ineffective assistance of appellate counsel as cause for his failure to present Issues I and II as federal constitutional claims to the state courts.  Additionally, Petitioner has not shown he is entitled to review of his claims through

the "fundamental miscarriage of justice" exception to the procedural bar.  Therefore, he is not entitled to federal review of these issues.

With regard to the third issue, that the life sentence imposed on Count I violated Petitioner's constitutional right to be free from cruel and unusual punishment, Petitioner presented his federal claim to the state court as Issue III on direct appeal (Ex. M at 17–20).  The First DCA affirmed the judgment of conviction per curiam without written opinion (Ex. P).

Petitioner contends his sentence  on Count I (life imprisonment, with the term of imprisonment to be suspended after 25 years, at which time Petitioner would be placed on sex offender probation for life with an active GPS monitor) is grossly disproportionate to the gravity of the alleged offense (ECF No. 24 at 11–12). Petitioner argues that brief contact with the buttocks or breast area of a girl under 12 years of age does not involve any oral or penile contact or penetration with the victim's mouth or sexual organs, which objectively makes it a less grave offense (*id.* at 12).  Furthermore, under Florida law, more harmful sexual offenses are subject to lesser sentences than the suspended life sentence imposed in his case.  Moreover, his sentence is disproportionate to the sentence imposed in other jurisdictions for the same conduct (*id.*).  Petitioner cites Solem v. Helm, 463 U.S. 277 (1983) and Harmelin v.

<u>Michigan</u>, 501 U.S. 957 (1991) as the clearly established federal law governing this claim (*id.*).

The Eighth Amendment of the United States Constitution states that "cruel and unusual punishments [shall not be] inflicted."  According to the Supreme Court, this clause "prohibits . . . sentences that are disproportionate to the crime committed." <u>Solem v. Helm</u>, 463 U.S. 277, 284, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983). However, "outside the context of capital punishment, successful challenges to the proportionality of particular sentences will be exceedingly rare."  *Id.* at 289–90. (quotation and edits omitted).  In <u>Helm</u>, the defendant was sentenced to life imprisonment without parole for writing a "no account" check for $100.  436 U.S. at 281.  The defendant was previously convicted of six nonviolent felonies, including three convictions for third-degree burglary, one conviction for obtaining money under false pretenses, one conviction for grand larceny, and one conviction of driving while intoxicated (third offense). *See id.* at 279–80.  The Supreme Court noted that Helm's crime was "one of the most passive felonies a person could commit. . . .  It neither involved violence nor threat of violence to any person."  *Id.* at 296.  Further, all of Helm's prior crimes were nonviolent, and none was a crime against a person.  *Id*. at 297.  The Supreme Court stated that when sentences are reviewed under the Eighth

Amendment, courts should be guided by objective criteria, including:  "(i) the gravity

of the offense and the harshness of the penalty; (ii) the sentences imposed on other

criminals in the same jurisdiction; and (iii) the sentences imposed for commission of

the same crime in other jurisdictions."  *Id.* at 292.  The Court concluded that the

sentence of life imprisonment without parole was "significantly disproportionate to

[the] crime, and . . . therefore prohibited by the Eighth Amendment."  *Id.* at 303.

In Harmelin v. Michigan, 501 U.S. 957 (1991), the Supreme Court recognized

that its 5–to–4 decision in Helm "was scarcely the expression of clear and well

accepted constitutional law."  501 U.S. at 965.  The Court went on to conclude that

the Eighth Amendment contains no proportionality guarantee, except perhaps in the

death penalty context.  *Id.* at 965, 994.  The Court then considered the defendant's

argument that his sentence of life imprisonment without parole for possessing 672

grams of cocaine violated the Eighth Amendment, because it was imposed without

any consideration of so-called mitigating factors, such as the fact that he had no prior

felony convictions.  *Id.* at 994.  The Court recognized that, as with proportionality, an

individualized determination that a punishment is "appropriate" is required in the

death penalty context.  *Id.* at 995.  However, the Court refused to extend the so-called

"individualized capital-sentencing doctrine" to non-capital sentences.  *Id.*  The Court

upheld Harmelin's of life imprisonment without parole as constitutional.

After <u>Harmelin</u>, the Supreme Court has considered Eighth Amendment

challenges to non-capital sentences imposed pursuant to recidivist laws.[11]  In <u>Lockyer</u>

<u>v. Andrade</u>, 538 U.S. 63, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003), the Supreme

Court considered whether "two consecutive terms of 25 years to life for stealing

approximately $150 in videotapes is grossly disproportionate in violation of the

Eighth Amendment" when imposed under California's "three strikes" law.  538 U.S.

at 70.   The Supreme Court noted that the only relevant clearly established law

amenable to the "contrary to" or "unreasonable application of" framework of

§ 2254(d)(1) "is the gross disproportionality principle, the precise contours of which

are unclear, applicable only in the "exceedingly rare" and "extreme" case."  *Id.* at 73

(citing <u>Harmelin</u>, 501 U.S. at 1001 (Kennedy, J., concurring in part and concurring in

judgment); <u>Helm</u>, 463 U.S.  at 290; <u>Rummel v. Estelle</u>, 445 U.S. 263, 272, 100 S. Ct.

1133, 63 L. Ed. 2d 382 (1980).  The Supreme Court held that the California Court of

Appeal's decision affirming Andrade's two consecutive terms of 25 years to life in

---

[11] The Supreme Court has also considered Eighth Amendment challenges to non-capital
sentences imposed pursuant to juvenile sentence, *see* <u>Graham v. Florida</u>, 560 U.S. 48, 130 S. Ct.
2011, 176 L. Ed. 2d 825 (2010) and <u>Miller v. Alabama</u>, 567 U.S. —, 132 S. Ct. 2455, 183 L. Ed. 2d
407 (2012), but those cases are not controlling in the adult sentencing context.

prison for a "third strike" conviction was not "contrary to" or an "unreasonable application" of "clearly established" law.  538 U.S. at 76.

In Ewing v. California, 538 U.S. 11 (2003), the defendant shoplifted three golf clubs, each valued at $399.  *Id.* at 18.  Because the defendant had prior convictions of three burglaries and a robbery, he was sentenced to prison, for twenty-five years to life under California's "three strikes" law.  *Id.* at 20.  The Supreme Court considered the gravity of the offense compared to the harshness of the penalty, but noted that the gravity of the offense was not merely shoplifting three golf clubs; rather, it was felony grand theft for stealing nearly $1,200 worth of merchandise after previously having been convicted of a least two "violent" or "serious" felonies.  *Id.* at 28.  The Court determined that Ewing's sentence was justified by the State's public-safety interest in incapacitating and deterring recidivist felons, and held that it was not grossly disproportionate and therefore did not violate the Eighth Amendment.  *Id.* at 30–31.

In sum, other than the life sentence imposed for the "most passive felony one could commit" in Helm, the Supreme Court has not reversed a non-capital, adult sentence for a term of years on Eighth Amendment grounds.

Here, the trial court imposed a sentence of life imprisonment, with the term of imprisonment to be suspended after 25 years, at which time Petitioner would be

placed on sex offender probation for life with an active GPS monitor.  That sentence

is distinguishable from one of life without parole.  Additionally, Petitioner's crime

was not a nonviolent property offense; rather, it was a crime of unlawful sexual

touching of a child.  "[C]ourts have recognized the importance of protecting children,

and the seriousness of violating laws designed to protect children."  Hong v. Sec'y

Dep't of Corrs., 478 F. App'x 648, 652 (11th Cir. 2012) (unpublished) (citing

Ashcroft v. Free Speech Coal., 535 U.S. 234, 240, 122 S. Ct. 1389, 152 L. Ed. 2d 403

(2002) (recognizing the state's compelling interest in prosecuting those who promote

the sexual exploitation of children.)).  Additionally, Petitioner was convicted of more

than one count—he was convicted of one count of lewd or lascivious molestation on

a person less than 12 years of age, and one count of attempted lewd or lascivious

molestation on a person between the ages of 12 and 16 years of age.  Courts have

recognized the need to punish multiple counts of conviction more seriously than a

single count.  What is more, Petitioner had a prior felony conviction for a violent

crime against a person, namely, aggravated assault with a deadly weapon.[12]

_____

[12] According to Petitioner's sentencing scoresheet, he received sentencing "points" for the
following prior convictions: two prior felony convictions for possession of cocaine, one prior felony
conviction for escape, one prior felony conviction for aggravated assault with a deadly weapon, and
seven prior convictions of various misdemeanors (Ex. A at 61–62).  Petitioner's sentencing points
resulted in a lowest permissible prison sentence of 108.45 months (id.).  The statutory maximum for
his conviction of Count I was life imprisonment (id.); see also Fla. Stat. §§ 775.082, 800.04(5)(c).

Petitioner has failed to demonstrate that the state court looked to incorrect precedent, or confronted a factual situation that was materially indistinguishable from a prior Supreme Court case.  Therefore, he has not demonstrated he is entitled to relief under the "contrary to" language of § 2254(d)(1).

Furthermore, Petitioner has not demonstrated that the state court unreasonably applied Supreme Court precedent in rejecting his Eighth Amendment claim.  He has not shown that no reasonable jurists could disagree that his case qualifies as the "extraordinarily rare" case where a term of imprisonment is so grossly disproportionate to the offenses of conviction that it violates the Eighth Amendment. *See* United States v. Bowers, 811 F.3d 412, 431–33 (11th Cir. 2016) (defendant's 182-year sentence for brandishing a firearm during the course of eight robberies was not so grossly disproportionate to the offense committed as to violate the proportionality principle of the Eighth Amendment, even though the guidelines sentencing range was 210–262 months, where the underlying criminal conduct was severe); United States v. Mozie, 752 F.3d 1271, 1290 (11th Cir. 2014) (sentence of life imprisonment for sex trafficking, conspiring to commit child sex trafficking, and producing child pornography, did not constitute cruel and unusual punishment); United States v. McGarity, 669 F.3d 1218, 1256–57 (11th Cir. 2012) (life sentences

imposed on defendants convicted of participating in child pornography ring which members of law enforcement community had investigated for several years and through several countries, in which they observed defendants and their cohorts sharing more than 400,000 images and 1,000 videos, many of which showed brutal and sadistic sexual acts being committed against children of all ages and nationalities, were not so grossly disproportionate to defendants' offenses, when considered in light of harm that defendants' conduct had caused to defenseless minors, as to violate Eighth Amendment prohibition on cruel and unusual punishment); McCullough v. Singletary, 967 F.2d 530, 535–36 (11th Cir. 1992) (sentence of life in prison without possibility of parole for first-degree burglary and sexual assault, which sentence was enhanced by defendant's prior juvenile convictions, did not constitute cruel and unusual punishment); United States v. Willis, 956 F.2d 248, 251 (11th Cir. 1992) (rejecting Eighth Amendment challenge to mandatory life sentence of possession with intent to distribute at least five kilograms of cocaine); Williams v. Johnson, 845 F.2d 906, 909–11 (11th Cir. 1988) (five life sentences imposed upon defendant's conviction of five counts of forgery, pursuant to Alabama Habitual Offender Act, was not disproportionate under Eighth Amendment, where defendant was eligible for parole after seven years of incarceration); Seritt v. State of Ala., 731 F.3d 728, 731–37

(11th Cir. 1984) (mandatory life imprisonment sentence imposed on a defendant, under a recidivist law, upon conviction for robbery, where defendant had been previously convicted of a trilogy of felonies, does not necessarily constitute cruel and unusual punishment under the Eighth and Fourteenth Amendments); *see also, e.g.*, Hong, 478 F. App'x at 652 (state court's rejection of petitioner's Eighth Amendment challenge to sentence of 400 years in prison, imposed for conviction of 80 counts of possession of material depicting a sexual performance by a minor, was not contrary to, or an unreasonable application of, federal law); United States v. Carpenter, 457 F. App'x 889, 896 (11th Cir. 2012) (unpublished) (concurrent mandatory life sentences were not unconstitutionally excessive for defendant convicted of multiple drug trafficking counts, including conspiracy to distribute powder and crack cocaine, and distribution of powder and crack cocaine); United States v. Lee, 268 F. App'x 813, 817 (11th Cir. 2008) (unpublished) (mandatory life sentence for possession with intent to distribute cocaine base did not violated Eighth Amendment); United States v. Ward, 154 F. App'x 190, 192 (11th Cir. 2005) (unpublished) (mandatory term of life imprisonment for four counts of possession with intent to distribute cocaine base and being a felon in possession of a firearm did not violate Eighth Amendment).

Therefore, Petitioner is not entitled to federal habeas relief on his Eighth Amendment challenge to his sentence.

IV.    CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party,

that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>14</u><sup>th</sup> day of March 2016.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.